Alison **FORSYTHE**

v.

**MICROTOUCH SYSTEMS, INC.**

**Civil Action No. 94–12505–RGS.**

United States District Court, D. Massachusetts.

Sept. 27, 1996.

Lisa E. Krakow, Boston, MA, for Alison Forsythe.

Judith A. Malone, Mary Ellen Ales, Boston, MA, for Microtouch Systems, Inc.

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON ALL COUNTS OF THE AMENDED COMPLAINT AND PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT ON COUNTS V, VII AND VIII

STEARNS, District Judge.

This employment discrimination case arises from the January 5, 1994 termination of Alison Forsythe from her job as a sales manager at defendant Microtouch Systems, Inc. Forsythe, a highly productive salesperson at Microtouch, alleges that her firing was motivated by gender bias, evidenced in part by the way in which she was compensated compared to her male counterparts. Microtouch acknowledges Forsythe's talent as a salesperson, but claims that the internal friction generated by her aggressive personality and confrontational style outweighed her otherwise considerable contributions to the company.

The Amended Complaint asserts eight counts against Microtouch: unlawful termination because of sex in violation of Title VII (42 U.S.C. § 2000e et seq.) and M.G.L. c. 151B (counts I and II); discrimination in

terms and conditions of employment in violation of Title VII and M.G.L. c. 151B (count III and IV); violation of the Massachusetts Equal Pay Act, M.G.L. c. 149, § 105A (count V) [1]; breach of the common law covenant of good faith and fair dealing (count VI); violation of the Massachusetts weekly payment of wages law, M.G.L. c. 149, § 148 (count VII); and breach of contract (count VIII). Before the court is Microtouch's motion for summary judgment on all counts of the Amended Complaint, and a cross-motion by Forsythe for summary judgment on counts V, VII, and VIII.

## FACTS

The material facts, viewed in the light most favorable to Forsythe, are these.[2] Microtouch manufactures "touchscreens" for interactive computers. Microtouch markets the bulk of its products directly through commissioned salespersons. In 1990, William Keller, Microtouch's Vice President of Sales, retained Carol Knipper, a personnel consultant, to recruit candidates for two sales managers positions. Keller hired Forsythe and James Ragonese on Knipper's recommendation in August of 1990.

Knipper proposed that Keller offer Forsythe a compensation package worth "in the mid–$80,000 range, a base salary of $45,000, and $2,500 in moving expenses. Knipper Aff., at ¶ 12. For Ragonese, Knipper suggested a compensation plan worth at least $85,000 and a base salary of $49,000. Knipper based her recommendations on three factors: the amount of money that Forsythe and Ragonese had each requested; their current earnings; and their years of relevant work experience.[3]

Keller offered Forsythe a compensation plan worth $95,500 if she achieved 100% of her targeted sales, a base salary of $45,000, and a one-time payment of $2,500 for moving expenses. Forsythe was to receive a commission of 2.4% on her sales goal of $2,000,000, which would rise to 4% on all sales in excess of her quota. Keller offered Ragonese a compensation plan worth $104,000 if he achieved 100% of his sales quota, a base salary of $49,000, and a commission of 2.2% on his first $2,500,000 in sales. If Ragonese sold more than $2,500,000 in 1990, his commission would increase also to 4%. Ragonese did not receive a moving allowance. In sum, Keller offered Ragonese a compensation package optimally worth $8,500 more than the compensation plan that he offered to Forsythe.[4] "Due to the differences in their 1990 sales as well as in their compensation plans, Microtouch paid $21,375.38 to the plaintiff and $29,006.04 to Mr. Ragonese in compensation in 1990." Defendant's Statement of Undisputed Facts, at 6.

When Forsythe asked Keller about the disparity between the two offers, Keller explained that because Ragonese was a man, he would need more money to support a wife

---

1. There is no analogous claim under the federal Equal Pay Act.

2. The facts are drawn from defendant's Statement of Undisputed Facts (where in fact undisputed) and the two volumes of affidavits, deposition extracts, and other materials submitted by the parties. Plaintiff did not submit a Statement of Disputed Facts. In the absence of such a Statement, I have relied on Plaintiff's Memorandum of Law to the extent that its assertions have factual support in the record.

3. Forsythe told Knipper that she wanted a compensation plan worth at least $75,000, including a base salary of $45,000, and $5,000 in moving expenses. She stated that she had earned $60,000 at Alloy Computer Products in 1989 and expected to earn $75,000 in 1990. Forsythe had six years of relevant work experience. Ragonese asked for a $50,000 base salary and an overall compensation plan worth at least $85,000–$90,-

000. He told Knipper that he expected to earn approximately $85,000 at Imagitex, Inc. in 1990. Ragonese had thirteen years of relevant work experience.

4. On the other hand, Forsythe was given a more attractive commission structure that, had she achieved her quota, would have given her higher earnings than Ragonese for a comparable performance. This is somewhat academic given the fact that both Forsythe and Ragonese started work in August of 1990 and neither would have been realistically expected to attain their sales goals for that year. The differing commission structures might explain why Forsythe earned slightly more than Ragonese in 1991, but, as will be explained, the details of the respective 1991 compensation plans have not been offered by either party.

and children.[5] See Forsythe Aff., at ¶ 2.[6] Forsythe accepted Keller's offer and signed non-disclosure and non-compete agreements.[7]

For reasons that are not clear, the parties are unable to offer any information about compensation plans in 1991.[8] It is, however, undisputed that Forsythe earned $112,649.55 in 1991, and Ragonese $111,261.38. During 1991, Forsythe's sales constituted approximately thirty percent of Microtouch's gross revenue.

Keller also determined Forsythe's and Ragonese's compensation plans in 1992. Forsythe was offered a $49,000 base salary and approximately $40,000 in direct commissions if she achieved 100% of her targeted sales. Ragonese was also offered a $49,000 base salary and approximately $45,000 in direct commissions if he achieved his sales quota. Forsythe and Ragonese both received a $3,000 bonus. Ragonese's 1992 plan was thus optimally worth $5,000 more than Forsythe's. Keller attributed the narrowing of the pay gap to Forsythe's two years of experience at Microtouch and her successful sales record. Keller Aff., at ¶ 18.

In 1992, Forsythe managed sales within Microtouch's primary domestic markets. Ragonese had responsibility for the initially less desirable gaming and entertainment market. The gaming market, however, exploded after five states legalized video lottery terminals. Ragonese sold approximately twice his quota in 1992, while Forsythe sold approximately 110% of hers. As a result, Forsythe earned $92,831.55 in 1992, while Ragonese earned $224,359.10.

Keller left Microtouch in March of 1992. James Logan, Microtouch's founder and President, served as interim Vice–President of Sales from February to July of 1992. Jack Dutzy served as Microtouch's Vice–President of Sales from July to December of 1992. Dutzy was highly complimentary of Forsythe's abilities. Dutzy described Forsythe as Microtouch's "best sales manager," having "excellent management skills" that were "superior to those of her peers" and reflected in "highly professional [behavior] with everyone (including employees and external customers),' both in terms of her conduct and ethics." Dutzy Aff., at ¶¶ 4, 5, & 7. Dutzy stated that he had never observed Forsythe act in a confrontational or disruptive manner, and described her as "a team player ... committed to the best interests of the company." Dutzy Aff., at ¶¶ 8–10.[9]

In January of 1993, Robert Senior, who had managed Microtouch's United Kingdom operations, became Vice–President of Sales.[10] Microtouch was in a period of exponential growth and having difficulty keeping up with demand for its products. As a result, ten-

---

5. Forsythe states that aside from Ragonese she is unaware of any male who was paid more than she was for comparable work. Forsythe Dep., Vol. I, at 170–171.

6. Sometime later, Keller told Gayle Hubiscak, one of Forsythe's subordinates, that if he had to choose between laying off a man or a woman, he would choose the woman, even if she were better qualified, because men have families to support. See Hubiscak Aff., at ¶ 15. Keller denies both statements. He states that he relied on Knipper's recommendations and also gave considerable weight to Ragonese's greater years of experience and the fact that he had a Masters in Business Administration, while Forsythe did not. Keller Aff., at ¶¶ 7, 8, 13 & 21.

7. Forsythe agreed that any proprietary material would be returned to Microtouch if she were terminated. She also agreed not to work for any competitor of Microtouch for one year after termination. In return, Microtouch agreed that if Forsythe was unable to find suitable employment within a month of termination because of the non-compete agreement, it would pay her a monthly sum equal to her base compensation rate for the lesser of the period of unemployment or one year. Microtouch also reserved the right to waive the non-compete and pay her nothing. These agreements figure in the disputes over Forsythe's state statutory and common law claims.

8. Forsythe states in her deposition that her base salary remained the same for 1991, but that she does not recall her commission rate or sales quota. Forsythe Dep., Vol II, at 28.

9. In a similar vein, Gayle Hubiscak describes Forsythe as "always very professional in her attitude, conduct and demeanor" and states that she had "never observed Forsythe be confrontational with either her subordinates or peers." Hubiscak Aff., at ¶¶ 7, 10.

10. After Forsythe was fired by Microtouch, Dutzy recruited her to work with him at Proteon, where he had become Director of Sales. Dutzy Aff., at ¶ 14.

sions escalated between the sales and production departments. Senior counselled all of his sales managers, including Forsythe and Ragonese, to work with the production staff in a constructive, non-confrontational manner. Senior Aff., at ¶ 13.

Senior also restructured the responsibilities of the sales managers within his department. Before Senior's arrival, Forsythe was responsible for three primary markets. Senior decided to focus more of the department on growth markets. Senior Aff., at ¶ 3. Senior asked Forsythe to concentrate on one of Microtouch's largest group of customers, the point-of-sale (cash register) market. Ragonese was assigned to developing new markets for the company. Defendant's Statement of Undisputed Facts, at 12.

Senior also redesigned the sales managers' compensation plans, changing from a strict base salary plus commission basis to a more flexible formula incorporating a discretionary "qualitative" bonus. According to Senior, the bonus was not intended to reward sales, but to give managers an incentive to forego immediate commissions in the interest of developing future customers. In setting each sales manager's overall compensation plan, Senior states that he considered the short and long-term sales potential of the particular markets to which he or she was assigned. If the market was considered undeveloped, the qualitative bonus was a more significant factor in the sales manager's compensation package than it was for a sales manager assigned to an established market. Senior Aff., at ¶¶ 7, 8, & 9.

Senior decided that Forsythe and Ragonese would each receive $120,000 in 1993 if they achieved 100% of their sales plans, including a base salary of $50,000. Senior, however, provided different "qualitative" bonuses to account for his judgment as to the sales potential of their respective markets.

Senior divided the $70,000 variable in Ragonese's salary evenly between sales commissions and a bonus. Senior apportioned Forsythe's variable between a $10,000 bonus and $60,000 in commissions, ostensibly because her markets were fully developed. Senior Aff., at ¶ 11. Forsythe earned $135,756.16 from Microtouch in 1993, while Ragonese earned $84,796.18.

According to Senior and Geoffrey Clear, Microtouch's Vice President of Finance and Administration, complaints were received regularly about Forsythe's confrontational style with other employees, particularly those in the production department.[11] Senior Aff., at ¶¶ 14–16; Clear Aff., at ¶¶ 16–17. Both Senior and Clear claim that they did not have "problems with the male sales managers' conduct similar to those problems that they had with [Forsythe's] conduct." Statement of Undisputed Facts, at 15; Senior Aff., at ¶ 20; Clear Aff., at ¶ 15. Senior states that he regularly counselled Forsythe about her abrasive manner and arranged meetings between the plaintiff and other employees in an attempt to encourage a more cooperative approach. Senior Aff., at ¶¶ 19–20. According to Senior, Forsythe's conduct improved during the summer of 1993, however, two incidents in the fall of 1993 "convinced [him] that the problems with [Forsythe's] performance warranted termination." Statement of Undisputed Facts, at 16. The first was Forsythe's alleged belligerence at an intended "peace conference" between the sales and production staffs. The other was an incident where Gayle Hubiscak, one of Forsythe's "direct reports," was alleged to have verbally abused Janet Crystal, a worker in the production department. Senior states that after Hubiscak admitted that she had been in the wrong, Forsythe refused to discipline Hubiscak or concede that Hubiscak had acted improper.[12] Senior Aff., at ¶ 23. Senior states

11. Forsythe does not dispute the essentials of two instances related by Senior, one involving the pressuring of an employee of the finance department over pricing information, and the other a dispute over a refusal to extend credit to a customer, but she says that her conduct was not "extreme." Plaintiff's Opposition, at 6 & nn. 5, 8. She contends that "pushing" the production staff "to get their jobs done" was necessary "to generate sales in an environment that was rife with production and manufacturing problems." Id.

12. Forsythe does not dispute the essentials of these two incidents but states that "it is hard to believe that they were found to justify terminating the company's *best* sales manager." Plaintiffs Opposition, at 6–7 n. 8. Hubiscak maintains

that he concluded that Forsythe's "reports" had begun to emulate her aggressive management style. Id.

Despite Senior's criticisms of Forsythe's confrontational style, her performance reviews mention no particular problem in this area. In her one formal evaluation, given by Keller in February of 1992, Forsythe was said to exhibit " 'natural' manager skills ... she works generally well [with] and is respected by subordinates both in and out of her department ... she has natural leadership ability (through the example that she sets for her subordinates)." [13] Plaintiff's Ex. C. Moreover, in a bonus review conducted six months prior to Forsythe's termination, Senior stated that Forsythe had fully achieved her assigned objective of "mak[ing] a positive contribution to the sales management team and with other departments." Plaintiff's Ex. D. Keller had earlier graded Ragonese's "interpersonal skills [and] professionalism" a "mediocre" "C" (Forsythe received a "B"), and noted that "[f]rom time to time, [he] has managed to offend a litany of fellow workers, both his peers, subordinates, and supervisors.... [H]e must learn to temper his opinions and elevate his thinking to a more 'team' approach...." Plaintiff's Ex. E. According to Hubiscak, Ragonese was the subject of complaints by at least nine co-workers, among them Hubiscak, who criticized him for his condescending and aggressive demeanor. Hubiscak Aff., at ¶ 3. Forsythe never received a written warning that her behavior was objectionable, although Microtouch's personnel manual called for such warnings as part of the company's progressive discipline policy. Plaintiff's Ex. B.

Senior testified that he "observed [Forsythe] reduce one of her own direct reports, Ed Solomon, to tears and was later informed that this happened regularly." Statement of Undisputed Facts, at 13; Senior Aff., at ¶ 14. Solomon, while not denying the incident, states that he never witnessed Forsythe aggressively or unprofessionally confront anyone, nor had he ever heard Forsythe complained about in those terms. Solomon Aff., at ¶¶ 5.

In addition to Keller's explanation that men deserved to be paid more than women because of their family responsibilities, Forsythe states that Keller once told her to "do whatever it takes" to complete a particular sale, a remark that she interpreted to include having sex with the customer. Forsythe Dep., Vol. I at 113–114. (Keller denies that he intended any such connotation). Forsythe also complains that Senior spoke to her in a condescending manner which he did not use when addressing men, although she is unable to give any examples. Forsythe Dep., Vol II, at 5–7. She also states that Senior once asked Hubiscak to get coffee for participants at a sales meeting, but she admits that she did not witness the incident. Forsythe Dep., Vol. I, at 180–181. But see Hubiscak Aff., at ¶ 17.[14,15,16]

Forsythe was terminated the first week of January, 1994. Although Forsythe was owed $384.62 for accumulated vacation pay, and approximately $10,800 in commissions for the fourth quarter of 1993, Microtouch states that it refused to pay her because she would not return a $5,000 laptop computer, and because she refused to meet with Senior to discuss the exact amount of the commissions she was owed. Defendant's Statement of

---

that Forsythe was merely attempting to persuade Senior to hear Hubiscak's side of the story. Hubiscak Aff., at ¶ 21.

**13.** Under the heading "Interpersonal Skills," Keller noted that "in the past [Forsythe] was lacking the 'team' perspective and this brought her into conflict with her peers and supervisor."

**14.** Forsythe states that Senior often asked her to bring bagels to staff meetings, something that she does not recall him asking a male employee to do, although she concedes it might have been possible. Forsythe Dep., Vol. I, at 179–180. She does not dispute Senior's testimony that salesper-

sons (male and female) rotated the responsibility of bringing refreshments to the monthly sales meetings. Id. at 179; Senior Aff., at ¶ 5.

**15.** Forsythe also alleges that Senior once offered to carry her luggage in an airport. Forsythe Dep., Vol. I, at 177. I am not sure what Forsythe expects to be made of this courteous gesture.

**16.** In her Opposition Memorandum, at 16, Forsythe says that other women at Microtouch complained about Senior's treatment of them, but I can find nothing in the materials (other than Hubiscak's Affidavit) to support this claim.

Undisputed Facts, at 19–20. Forsythe eventually returned the computer, and Microtouch paid her $22,861.12 in commissions. Microtouch also paid Forsythe for the two days of accrued vacation pay, although not until two years after she was terminated. While Forsythe admits that she received these sums, she contends that she was in fact owed an additional $2,847.99 in earned commissions. Forsythe Aff., ¶ 10. She also concedes that she failed to return Microtouch's computer, Forsythe Dep., Vol. II, at 91, but insists that the appropriate remedy was not to withhold earnings then due but "to file criminal charges or bring a civil action for breach of contract." Plaintiff's Opposition, at 32.

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when, based upon the pleadings, affidavits, and deposition evidence, "there is no genuine issue as to any material fact, and [where] the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Gaskell v. Harvard Co-op Society*, 3 F.3d 495, 497 (1st Cir.1993). To succeed, "the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990). An issue is only 'genuine' if there is sufficient evidence to permit a reasonable jury to resolve the point in the nonmoving party's favor. *NASCO, Inc. v. Public Storage, Inc.*, 29 F.3d 28, 32 (1st Cir. 1994).

### TITLE VII AND G.L. c. 151B

To establish a Title VII prima facie case of discrimination based upon gender, a plaintiff must show: (1) that she is a member of a protected class; (2) that she met legitimate job performance expectations; (3) that she experienced an adverse employment action; and (4) that the employer replaced her with a person of equal skill. See *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 15 (1st Cir.1994). In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Supreme

Court adopted a burden shifting analysis to be used in evaluating Title VII employment discrimination claims. Under the Supreme Court's model, once a plaintiff has established a prima facie case of discrimination, a presumption of discrimination arises. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employee's termination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 253–255, 101 S.Ct. at 1093–1095. If the employer produces evidence that an adverse employment action was taken for a legitimate reason, the *McDonnell–Burdine* presumption is rebutted and disappears from the case. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506–507, 113 S.Ct. 2742, 2746–2747, 125 L.Ed.2d 407 (1993). The burden of production then shifts back to the plaintiff, who must "introduce sufficient evidence to support two additional findings: (1) that the employer's articulated reason for the job action is a pretext, and (2) that the true reason is discriminatory. The plaintiff may rely on the same evidence to prove both pretext and discrimination, but the evidence must be sufficient for a reasonable factfinder to infer that the employer's decision was motivated by discriminatory animus." *Smith v. Stratus Computer, Inc.*, 40 F.3d at 16 (citations omitted). The *McDonnell–Burdine* framework addresses only the formal allocation of the burdens of production; the "ultimate burden of persuasion" remains at all times with the plaintiff. *St. Mary's*, 509 U.S. at 507, 113 S.Ct. at 2747; *Blare v. Husky Injection Molding Systems Boston, Inc.*, 419 Mass. 437, 445, 646 N.E.2d 111 (1995).

A different analysis applies to Forsythe's G.L. c. 151B claim. Although Massachusetts courts, as a rule, apply federal case law, including the *McDonnell–Burdine* burden-shifting analysis, when evaluating employment discrimination claims under Chapter 151B. See *Wheatley v. American Telephone & Telegraph Co.*, 418 Mass. 394, 397, 636 N.E.2d 265 (1994). The Supreme Judicial Court recently departed from this practice in a significant respect. Under *Blare*, 419 Mass. at 444–445, 646 N.E.2d 111, the plaintiff in a Chapter 151B case may

carry her burden of demonstrating the discriminatory animus of her employer by "offer[ing] evidence sufficient to support a determination .... that the employer's reason was a pretext [without more]."[17]

## DISCUSSION

### 1. Title VII & Chapter 151B

■ Forsythe grounds her Title VII claims on two theories: wrongful termination based on gender (count I), and gender discrimination manifesting itself in disparate terms and conditions of employment (count III).

I have no doubt that Forsythe has placed facts in the record sufficient to establish a prima facie case of gender discrimination with respect to her claims of wrongful termination.[18] She has also cast sufficient doubt on the veracity of Microtouch's proffered explanation for its actions to preserve her Chapter 151B claim for wrongful termination. See *Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1093 (1st Cir.1995). The question remaining is whether Forsythe has adduced sufficient evidence to meet the Title VII requirement that she also show that Microtouch's true motivation was "discriminatory animus" (the so-called "pretext-plus" requirement). See *LeBlanc v. Great Ameri-*

can *Ins. Inc.*, 6 F.3d 836, 842–843 (1st Cir. 1993).

In this regard, Forsythe points to the espousal by Keller of his anachronistic belief that men deserve to be paid more than women. Keller, however, left Microtouch two years before Forsythe's termination and obviously did not participate in the decision to fire her. Thus, Keller's chauvinistic bias has no bearing on Forsythe's Title VII termination claim. See *Smith*, 40 F.3d at 18. Nor has Forsythe offered any material evidence that Senior's decision to terminate her was motivated by an innate bias against women. Cf. *Lehman v. Prudential Ins. Co. of America*, 74 F.3d 323, 329 (1st Cir.1996). Summary judgment on this claim will therefore be granted to Microtouch.

■ The impact of Keller's statements on Forsythe's Title VII claim regarding the terms and conditions of her employment is more problematic. On their face, Keller's words, taken in conjunction with his implementation of a male-biased pay scheme, would appear to raise a sufficient inference of gender-based animus to defeat summary judgment.[19] Here, however, the statute of limitations intervenes. Keller's statements and actions transpired several years before July 1, 1994, the date on which Forsythe filed her complaint with the MCAD.[20] The filing

17. Plaintiff mistakenly contends that the standard under Title VII is identical to *Blare*, citing some admittedly confusing language in *St. Mary's*, 509 U.S. at 511, 113 S.Ct. at 2749. The First Circuit has pointed out that while under *St. Mary's* an exceptionally strong prima facie case coupled with disbelief of an employer's explanation "*could* provide a strong enough inference of actual discrimination to permit the fact-finder to find for the plaintiff ... we do not think that the Supreme Court meant to say that such a finding would *always* be permissible." *Woods v. Friction Materials, Inc.*, 30 F.3d 255, 261 n. 3 (1st Cir. 1994). "Thus, whether the plaintiff relies solely on [her] prima facie case and evidence of pretext or has additional evidence of specific intent as well, the plaintiff must *always* adduce evidence sufficient for a rational jury to conclude that the employer's action was motivated by an intent to [discriminate]." *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 39 (1st Cir.1995) (emphasis in original).

18. Microtouch devotes considerable energy to challenging the second element of plaintiff's prima facie case, that Forsythe "was doing [her] job

well enough to rule out the possibility that [she] was fired for inadequate job performance, absolute or relative." *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1013 (1st Cir.1979). The gist of the argument is that while Forsythe may have performed splendidly as a salesperson, she was an abject failure in the interpersonal aspects of her job. This may or may not be true, but Microtouch's internal evaluations of Forsythe as a manager contradict its present assessment of her abilities.

19. The differences in the two pay plans could, as Microtouch contends, be viewed as relatively insubstantial and explained at least at their inception by Ragonese's many more years of experience and advanced degree. This is not, however, what Keller told Forsythe. Keller's explanation might cause a jury to conclude that gender bias, rather than some other permissible consideration, motivated his decision to pay Forsythe less.

20. In order for a claim of gender discrimination to remain viable, an MCAD complaint must be filed within 180 days of the last alleged act of discrimination. See *Sereni v. Star Sportswear*

was sufficient to preserve Forsythe's objection to the 1993 compensation plan;[21] however, her complaints regarding the 1990, 1991 and 1992 plans are actionable only if they can be viewed as part of a single continuing discriminatory act.

 In *Sabree v. United Brotherhood of Carpenters and Joiners,* 921 F.2d 396 (1st Cir.1990), the First Circuit explained that when a plaintiff can show that a series of similar discriminatory acts were perpetrated by his or her employer, and that the acts "emanat[ed] from the same discriminatory animus, [and that] each act constitut[ed] a separate wrong actionable under Title VII," then the entire series of acts can be considered collectively as a "continuing violation" of Title VII. Id. at 400, quoting *Jensen v. Frank,* 912 F.2d 517, 522 (1st Cir.1990). In such cases, the plaintiff may "reach back" and "recover for portions of the persistent process of illegal discrimination that antedated the limitations period." *McKenzie v. Sawyer,* 684 F.2d 62, 72 (D.C.Cir.1982).[22]

 To establish a continuing violation a plaintiff must first show that an act of discrimination took place within the limitations period. Assuming that the setting of the bonus differentials was such an act, Forsythe meets this first test. But "before a plaintiff can reach back and recover for a series of acts outside the limitations period, [s]he must prove a substantial relationship between the acts." *Sabree,* 921 F.2d at 401. In determining whether such a relationship exists, the most important factor is whether at the time of the prior act, the plaintiff knew or should have known she was being discriminated against. " 'A claim arising out of an injury which is 'continuing' only because a putative plaintiff knowingly fails to seek relief is exactly the sort of claim that Congress intended to bar by the [300] day limitation period.' " Id. at 402, quoting *Roberts v. Gadsden Memorial Hospital,* 850 F.2d 1549, 1550 (11th Cir.1988). This is to be distinguished "from a plaintiff who is unable to appreciate that [s]he is being discriminated against until [s]he has lived through a series of acts and is thereby able to perceive the overall discriminatory pattern." *Sabree,* 921 F.2d at 402. Here plaintiff, by her own account, was told by Keller in 1990 that she was being paid a lower base salary because she was a woman. "A knowing plaintiff has an obligation to file promptly or lose [her] claim." Id. Because Forsythe is unable to avail herself of a continuing violation theory, summary judgment will be granted to Microtouch on so much of Forsythe's Title VII terms and conditions of employment claim as involves any alleged act of discrimination occurring prior to September 3, 1993.

## CONCLUSION

 Federal jurisdiction in this case is premised on plaintiff's Title VII claims. Of these, all that remains is that aspect of Count III that involves the discretionary component of Forsythe's 1993 bonus. All other claims involve issues of state law, primarily plaintiff's claim of wrongful termination under Chapter 151B, a claim that also might well have been dismissed but for the fact that Massachusetts departs significantly from federal law in relaxing the quantum of evidence a plaintiff must produce to avoid summary judgment on an employment discrimination

---

*Mfg. Corp.,* 24 Mass.App.Ct. 428, 430, 509 N.E.2d 1203 (1987). If a claimant initially proceeds before the MCAD, she has 300 days to file a complaint with the EEOC. See 42 U.S.C. § 2000e–5; *Sabree v. United Brotherhood of Carpenters and Joiners,* 921 F.2d 396, 399–400 (1st Cir.1990).

**21.** Forsythe concedes that she greatly outearned Ragonese in 1993. Her complaint focuses on the fact that because Ragonese's compensation plan had a larger subjective component, it had the effect of "insulat[ing] Ragonese for poor sales performance without doing the same for Forsythe." Plaintiff's Opposition, at 21. If a jury were to reject Microtouch's explanation that different market conditions explain the disparate bonus structures, it is still difficult to perceive what damages Forsythe suffered. Because Forsythe earned more than the $120,000 target of her compensation package she would not have been eligible for a discretionary bonus.

**22.** A plaintiff may also defeat the statute of limitations by showing a systemic violation having "its roots in a discriminatory policy or practice; so long as the policy or practice itself continues into the limitation period." *Sabree,* 921 F.2d at 400 n. 7. Forsythe has offered no evidence that Microtouch implemented a policy or tolerated a pervasive practice of discriminating against women.

claim. Counts V–VIII are grounded on Massachusetts statutes (M.G.L. c. 149, §§ 105A and 148) and common law theories of breach of contract and breach of the implied covenant of good faith and fair dealing. Under 28 U.S.C. § 1367(c)(2), a district court may decline jurisdiction in a case where state causes of action "substantially predominate[ ] over the claim or claims over which the district court has original jurisdiction." In its present posture, this is such a case, and jurisdiction will therefore be declined. See *James v. Sun Glass Hut of Calif., Inc.*, 799 F.Supp. 1083, 1085 (D.Colo.1992).[23]

### ORDER

For the foregoing reasons, defendant's motion for summary judgment is *ALLOWED* in part. Summary judgment on count I will be entered in favor of the defendant. Summary judgment is *ALLOWED* on so much of Count III as involves claims accruing prior to September 3, 1993. The court declines jurisdiction over all surviving claims. Although there appears to be no statute of limitations issue with respect to any subsequent state proceeding, the attention of the parties is directed to 28 U.S.C. § 1367(d).

SO ORDERED.

---

**23.** Under the circumstances, no useful purpose would be served by comment on Forsythe's additional state law claims. These are better addressed by the Superior Court which is likely to have greater familiarity with the specific requirements of Massachusetts law.