[NOT FOR PUBLICATION--NOT TO BE CITED AS PRECEDENT]

 United States Court of Appeals
 For the First Circuit
 

No. 98-1410

 SONIA J. SZABO,

 Plaintiff, Appellant,

 v.

 TRUSTEES OF BOSTON UNIVERSITY, ET AL.,

 Defendants, Appellees.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. George A. O'Toole, Jr., U.S. District Judge]

 

 Before

 Stahl, Circuit Judge,

Reavley, Senior Circuit Judge,

 and Lipez, Circuit Judge.

 

William F. Green, with whom Robert A. Rossi and Law Office of
William F. Green were on brief, for appellant.
Lawrence S. Elswit for appellees.

 

 December 31, 1998
 REAVLEY, Senior Circuit Judge. Sonia Szabo appeals a
summary judgment entered against her in her suit against Boston
University (BU) and two individuals. We affirm.
 BACKGROUND
 Szabo's complaint alleged that she was terminated from
her position as a histology technician in the dermatology lab of
the BU medical school. She claims that she was fired in
retaliation for making a complaint of sexual harassment, in
violation of Title VII, 42 U.S.C. 2000e-3(a). She also claims
that defendants violated the Family and Medical Leave Act (FMLA),
29 U.S.C. 2601-2654, in connection with leave necessitated by her
pregnancy.
 DISCUSSION
 Under Fed. R. Civ. P. 56(c), the district court shall
enter summary judgment for the moving party if the record discloses
"that there is no genuine issue as to any material fact and that
the moving party is entitled to a judgment as a matter of law."
Rule 56 "mandates the entry of summary judgment, after adequate
time for discovery and upon motion, against a party who fails to
make a showing sufficient to establish the existence of an element
essential to that party's case, and on which that party will bear
the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S.
317, 322 (1986). Under modern summary judgment practice "there is
no issue for trial unless there is sufficient evidence favoring the
nonmoving party for a jury to return a verdict for that party. If
the evidence is merely colorable, or is not significantly
probative, summary judgment may be granted." Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted). To
be a "genuine" issue of material fact, "the evidence relevant to
the issue, viewed in the light most flattering to the party
opposing the motion, must be sufficiently open-ended to permit a
rational factfinder to resolve the issue in favor of either side." 
National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st
Cir. 1995) (citations omitted).
A. Title VII
 Szabo alleged that she was terminated in retaliation for
complaining about sexual remarks made by her supervisor, Labadie. 
She testified that in the summer of 1993, Labadie, in a vulgar
manner, asked whether she was having sexual relations with a
coworker. She complained to the lab director, Dr. Bhawan, about
the incident, and claims that Bhawan did not take her complaint
seriously. Bhawan testified that he recalled the incident as
related to him by Szabo, that he was shocked and surprised, and
apologized to Szabo on his own behalf and on behalf of Labadie. 
Bhawan testified that at his behest Labadie apologized to Szabo in
Bhawan's presence. Labadie confirmed making such an apology, but
Szabo testified that no apology occurred. 
Szabo also complained to Dr. Gilchrest, the chair of the
dermatology department. Szabo testified that Gilchrest considered
the matter a serious one. According to Szabo, Labadie then told
Szabo, "I don't see why you are complaining to Dr. Gilchrest," and
told her he was going to keep a file on her and "you'll pay for
this." Labadie denied making such threats. Gilchrest remembered
having a brief meeting with Szabo where Szabo discussed
difficulties at work, but Gilchrest was sure that Szabo did not
mention sexually offensive language from a supervisor. 
Szabo testified that after the incident with Labadie,
Labadie changed the attendance policy. Labadie agreed that there
was a change in attendance procedure requiring employees to use
time sheets. Labadie denied making the change in policy himself,
but claimed that it came from the university. 
Szabo became pregnant in the summer of 1994. Szabo
offered medical records showing hospital emergency care in the
summer and fall of 1994 relating to her pregnancy. She was also
admitted to Brigham and Women's Hospital in March of 1995. Her
physician admitted her after he failed to detect a fetal heartbeat. 
The pregnancy ended in a stillbirth.
Szabo was fired in the fall of 1995, more than two years
after the alleged sexual harassment. Szabo's supervisor, Hasan,
testified that Szabo was fired because of her attendance problems. 
He testified that her poor attendance "was a big issue in the lab,"
and that throughout 1995 he spoke to her almost every other day
about her attendance. Szabo admitted receiving "a lot" of written
warnings about her attendance, but claimed that she and others in
the lab made fun of the warnings, because they knew the warnings
were in retaliation for the 1993 incident.
On October 20, 1995 Labadie wrote Szabo, notifying her
that she was being terminated for poor attendance. The letter
listed eight instances in which BU had warned Szabo about her poor
attendance, including the November 8, 1993 announcement of the new
attendance policy directed to all employees. It documented seven
occasions in September and October of 1995 where Szabo was observed
leaving early, as well as a pattern of arriving late and several
occasions when Szabo did not show up for work at all. Szabo
testified that she had permission to leave early on the dates
referenced in the letter. 
We generally analyze claims of retaliation under Title
VII as we would other discrimination claims. We look to the
burden-shifting framework established by McDonnell Douglas Corp. 
v. Green, 411 U.S. 792 (1973), and later Supreme Court cases. To
establish a prima facie case of retaliation, the plaintiff must
show that she engaged in protected conduct under Title VII, that
she suffered an adverse employment action, and that a causal
connection exists between the protected conduct and the adverse
action. Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st
Cir. 1996). Once the plaintiff makes out a prima facie case, the
burden of production shifts to the defendant to articulate a
legitimate, non-retaliatory reason for its employment decision. 
Id. Under the McDonnell Douglas framework, once the defendant
offers such a reason, the presumption raised by the prima facie
showing "drops from the case." Hidalgo v. Overseas Condado Ins.
Agencies, Inc., 120 F.3d 328, 335 (1st Cir. 1997) (quoting St.
Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993)). The
plaintiff must show that the defendant's non-discriminatory reason
for its action is pretextual, and at all times "the plaintiff
retains the ultimate burden to show that he has been the victim of
intentional discrimination." Provencher v. CVS Pharmacy, Division
of Melville Corp., 145 F.3d 5, 10 (1st Cir. 1998).
"To prevail under federal law, it is insufficient for a
plaintiff merely to undermine the veracity of the employer's
proffered justification; instead, she must muster proof that
enables a factfinder rationally to conclude that the stated reason
behind the adverse employment decision is not only a sham, but a
sham intended to cover up the proscribed type of discrimination." 
Dichner v. Liberty Travel, 141 F.3d 24, 30 (1st Cir. 1998). The
plaintiff must elucidate specific facts that would enable a jury to
make such findings, and "the plaintiff cannot avert summary
judgment if the record is devoid of adequate direct or
circumstantial evidence of discriminatory animus on the part of the
employer." Hidalgo, 120 F.3d at 335 (quoting LeBlanc v. Great Am.
Ins. Co., 6 F.3d 836, 843 (1st Cir. 1993)). "[B]efore becoming
entitled to bring the case before the trier of fact," the plaintiff
"must show evidence sufficient for the factfinder reasonably to
conclude that the employer's decision to discharge him or her was
wrongfully based" on the alleged discriminatory animus. LeBlanc,
6 F.3d at 843. "On summary judgment, the need to order the
presentation of proof is largely obviated, and a court may often
dispense with strict attention to the burden-shifting framework,
focusing instead on whether the evidence as a whole is sufficient
to make out a jury question as to pretext and discriminatory
animus." Fennell, 83 F.3d at 535.
We conclude that summary judgment was properly granted
because a rational finder of fact, viewing the record as a whole,
could not find that BU's legitimate, nondiscriminatory reason for
firing Szabo was pretextual, and that the firing was instead the
result of an illegal retaliatory motive. Summarizing, defendants
presented compelling evidence that Szabo had a history of poor
attendance, which continued years after the alleged incident of
sexual harassment by Labadie and up to the month of termination. 
In addition to the evidence discussed above, defendants produced
eight memos, written by Labadie and others, documenting attendance
problems. Szabo offered no evidence that she made contemporaneous
objections to the criticism regarding her attendance. We agree
with the district court that the memos "reveal not an effort to
retaliate, but rather a remarkable patience with an employee with
attendance problems." We have held that the passage of time can
so weaken any claim of a causal connection between the alleged act
on which the retaliation claim is based and the employee's
termination as to make summary judgment appropriate. Mesnick v.
General Elec. Co., 950 F.2d 816, 828 (1st Cir. 1991). Szabo's
termination occurred over two years after Labadie's alleged sexual
harassment and her complaints to management. Szabo claims that she
was singled out under the attendance policy, but BU offered
evidence that several other employees received written and oral
warnings regarding attendance. On this record, Szabo's evidence of
retaliation is at best "merely colorable," Anderson, 477 U.S. at
249, and is not sufficiently probable to avoid summary judgment. 
"In order to survive summary judgment, the plaintiff must point to
evidence in the record that would permit a rational factfinder to
conclude that the employment action was retaliatory." King v. Town
of Hanover, 116 F.3d 965, 968 (1st Cir. 1997). We conclude that
Szabo failed to meet this burden.
Szabo also claims as a separate act of retaliation that
Dr. Bhawan refused to sign her application to become certified as
an histology technician in October of 1995, shortly before she was
terminated. Bhawan testified that Szabo never asked him to sign
such an application and that he would have signed it if asked. 
Viewing the evidence in a light most favorable to Szabo, we do not
believe that a rational jury could find that Bhawan's refusal to
sign the application was retaliation for Labadie's conduct over two
years earlier. Szabo never accused Bhawan of complicity in the
sexual harassment by Labadie, only that Bhawan did not take her one
complaint to him seriously enough. In the interim Szabo received
many warnings and reprimands about her attendance. Bhawan
testified that he did not give Szabo a small 1994 Christmas bonus
given to other employees because of her attendance problems. The
alleged refusal to sign the application is temporally too far
removed from Szabo's complaints about Labadie for a rational jury
to find a causal link between the protected activity (complaining
about Labadie) and the adverse personnel action (refusal to sign
the application), especially in light of all that transpired in
between.
B. FMLA
In her complaint Szabo alleged that defendants violated
the FMLA by denying her repeated requests for maternity leave. In
responding to defendants' summary judgment motion and on appeal,
Szabo additionally argues that defendants violated the FMLA by
demanding that she return to work, on threat of termination, after 
leave of only about two weeks following surgery.
Szabo offered evidence that on several occasions she
asked Labadie for medical leave forms. She testified that she
received a "runaround" in that Labadie referred her to personnel
officer McKinley for the forms and McKinley referred her back to
Labadie. Defendants produced a February 27, 1995 staff
request/notification for leave, signed by Szabo and Dr. Bhawan. 
While she admitted that her signature on the form was genuine,
Szabo denied ever seeing the document. Defendants also produced an
unsigned letter from George Snowden, assistant personnel director,
granting Szabo medical leave. Snowden swears that he sent the
letter, though Szabo claims that it was sent to the wrong home
address.
Szabo's pregnancy ended in a stillbirth, as explained
above. Szabo's physician, Dr. Olson, performed a caesarean section
on or about March 3, 1993. Olson, testified that patients normally
should be off work for four to six weeks after a caesarean section,
but patients could return earlier if they felt fine. Szabo
testified that about two weeks after the delivery lab supervisor 
Hasan called her at home and told her that she would be replaced if
she did not return to work. Hasan denied making such a call. 
Szabo then called Dr. Olson and asked him to prepare a letter
stating that she could return to work. According to Szabo, Olson
told her she was "crazy" to go back to work so soon. Nevertheless,
the letter states that Szabo "may return to work on March 22,
199[5] as she is recovering well." Olson testified that he did not
recall using the term "crazy" to describe Szabo's request for the
letter, but "I don't doubt that I said something to that effect,
but not meaning mentally crazy, but in the context that perhaps she
would like to allow herself more time for recovery and that maybe
she would be uncomfortable returning this early, and I would
encourage her staying out, but if she really wants to go back,
that's fine." Olson testified that he would not have written the
letter if Szabo was not well enough to return to work. Szabo
returned to work about two and one-half weeks after the delivery. 
Under the FMLA, an employee generally is entitled to 12
weeks of leave "[b]ecause of the birth of a son or daughter of the
employee and in order to care for such son or daughter," or
"[b]ecause of a serious health condition that makes the employee
unable to perform the functions of the position of such employee." 
29 U.S.C. 2612(a)(1). It is unlawful for an employer "to
interfere with, restrain, or deny the exercise of or the attempt to
exercise, any right provided under" the Act. Id. 2615(a). 
Violation of 2615 entitles the employee to recover "any wages,
salary, employment benefits, or other compensation denied or lost
to such employee by reason of the violation," or "in a case in
which wages, salary, employment benefits, or other compensation
have not been denied or lost to the employee, any actual monetarylosses sustained by the employee as a direct result of the
violation, such as the cost of providing care, up to a sum equal to
12 weeks of wages or salary for the employee." Id. 2617
(a)(1)(A).
We conclude that summary judgment was properly granted on
the FMLA claim. Szabo did not raise a material issue of fact of a
violation of the Act. Tragically, Szabo's child was stillborn, but
this means that she was not entitled to maternity leave under the
Act, since such leave is only required under the Act in order to
care for a son or daughter. Nor did Szabo demonstrate "a serious
health condition that makes the employee unable to perform the
functions of the position of such employee," an alternative basis
for leave under the Act. Her own doctor wrote a letter saying that
she was able to return to work "as she is recovering well." 
Dr. Olson also testified that recovery times vary and that he would
not have written the letter if Szabo was unable to return to work,
and that Szabo did not tell him that her employer was pressuring
her to return to work. He stated that if Szabo had told him her
employer was pressuring her to return to work, he would have noted
this reason on her chart. Instead, his notes indicate: "Patient
feels well. Wants to return to work. Minimal pain." True, Szabo
claims that she prevailed upon her doctor to write the note because
she was afraid BU would fire her if she did not return to work, but
she points to no evidence showing that upon her return she was
"unable to perform the functions of the position of such employee."
Szabo separately argues that BU's ordering her back to
work was an independent act of retaliation under Title VII. If
Szabo is arguing that cutting short her leave was retaliation for
complaining about Labadie's inappropriate sexual remarks, this
claim suffers from the same deficiencies as her termination claim. 
The alleged demand that she return to work occurred almost two
years after Szabo's complaints about Labadie's remarks; in the
interim there were numerous documented warnings about her poor
attendance. The supervisor who allegedly demanded that she return
to work denied making any such demand, but did testify that he was
warning her almost every other day about her poor attendance. In
any event, this supervisor, Hasan, was not the supervisor who
allegedly sexually harassed Szabo, and she offered insufficient
proof to allow a rational jury to find that Hasan had any reason or
motive to retaliate against her because of her complaints of sexual
harassment leveled at Labadie years earlier.
Affirmed.