Ann RIDGE, Plaintiff

v.

**CAPE ELIZABETH SCHOOL DEPARTMENT,** Defendant.

Civil No. 98–292–P–C.

United States District Court, D. Maine.

Oct. 27, 1999.

Robert W. Kline, Portland, ME, for plaintiff.

Jerrol A. Crouter, Melissa A. Hewey, Drummond, Woodsum, Plimpton & Macmahon, Portland, ME, for defendant.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

Plaintiff Ann Ridge has brought this discrimination action against Defendant Cape Elizabeth School Department ("CESD") as a result of its termination of Plaintiff's employment. Plaintiff's four-count Amended Complaint (Docket No. 2) alleges that CESD violated the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") (Count I), the Age Discrimination in Employment Act of 1967 ("ADEA") (Count II), the Civil Rights Act of 1991, 42 U.S.C. §§ 1981 and 1981a (Count III), and the Maine Human Rights Act, 5 M.R.S.A. § 4551 *et seq.* ("MHRA") (Count IV). Now before the Court is Defendant CESD's Motion for Summary Judgment with respect to all four counts of Plaintiff's Amended Complaint. *See* Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law (Docket No. 9). For the reasons stated below, the Court will grant CESD's Motion for Summary Judgment as to Plaintiff's claims of actual and perceived discrimination under the ADA in Count I and under the MHRA in Count IV. The Court will also grant CESD's Motion for Summary Judgment as to Plaintiff's claims of age discrimination under the ADEA in Count II and under the MHRA in Count IV. Finally, the Court will grant CESD's Motion for Summary Judgment as to Plaintiff's claims under 42 U.S.C. §§ 1981

and 1981a in Count III of the Amended Complaint.

## I. BACKGROUND

In 1988, Plaintiff Ann Ridge began work in the Cape Elizabeth High School library ("CEHS library") as an Education Technician II. Defendant's Statement of Undisputed Material Facts ¶ 1 (Docket No. 10); Plaintiff's Reply to Defendant's Statement of Undisputed Material Fact ¶ 1 (Docket No. 14). Approximately two years later, Joyce Bell became the head librarian of the CEHS library. Deposition of Ann Ridge at 7. For some years thereafter, Plaintiff and Bell enjoyed a good working relationship. *Id.* at 12. Their relationship, however, changed in December of 1994, *Id.* at 13.

Prior to the Christmas break of that year, Plaintiff and Bell had a disagreement over the manner in which Plaintiff had handled a student disciplinary matter. Ridge Dep. at 17. Although Plaintiff believed that she had handled the situation properly, she felt that Bell should not have questioned her judgment in the matter. *Id.* at 18. Following the Christmas break, therefore, Plaintiff reported the incident between herself and Bell to Cape Elizabeth Assistant Principal Randy Ray in order to voice her concerns about Bell's treatment of her. *Id.* at 19. Plaintiff wanted Ray to facilitate a discussion between herself and Bell in order to resolve the matter. *Id.* at 20. Ray, however, responded to Plaintiff's request by indicating that Bell was Plaintiff's "boss," and that she should do what Bell told her. *Id.* Plaintiff believed that Ray's response to her request was "inappropriate," and that CESD should have sought to foster a better relationship between herself and Bell. *Id.*

Thereafter, the relationship between Bell and Plaintiff deteriorated. Plaintiff's Reply to Defendant's Statement of Undisputed Material Facts ¶ 6. The two individuals no longer exchanged friendly banter and from Plaintiff's viewpoint, the two hardly communicated at all. *Id.* As a result of the growing rift between Bell and Plaintiff, and the negative effect the two women's relationship was having on the CEHS library, a meeting was held on March 15, 1995 at the behest of the CESD Superintendent Connie Goldman. *Id.* at ¶ 7. Also in attendance at that meeting were Plaintiff, Bell, Cape Elizabeth Principal Rick Difusco, and Plaintiff's union representative. *Id.* The meeting itself was informal, and was not intended to be a disciplinary session. *Id.* Rather, the meeting was an attempt on Goldman's part to mediate a solution to Plaintiff's and Bell's inability to work together. *Id.* Unfortunately, the meeting proved to be ineffective as the relationship between Bell and Plaintiff continued to decline throughout the remainder of the 1995 school year and into the following fall.

In September of 1995, issues regarding the remagnetizing of books arose in the CEHS library. Defendant's Statement of Undisputed Material Facts ¶ 9; Plaintiff's Reply to Defendant's Statement of Undisputed Material Facts ¶ 9. Specifically, at that time, Plaintiff was the only person in the library doing the remagnetizing work and she was concerned, primarily, with the health risks associated with prolonged exposure to electromagnetic fields ("EMFs"). Plaintiff's Reply to Defendant's Statement of Undisputed Material Facts ¶ 10. Plaintiff raised this concern with Bell, but Bell assured Plaintiff that the remagnetizing of books was safe. Ridge Dep. at 65–66. Unpersuaded, in November of 1995, Plaintiff went to her physician, Dr. Margaret Shepp, to express her concern regarding the exposure to the EMFs; Plaintiff also at that time told Shepp that the repetitive nature of the re-magnetizing work bothered her arms. Ridge Dep. at 69–72; Shepp Dep., at 17.

Shepp provided Plaintiff with a medical letter addressing the health issues associated with EMFs and the hazards of repetitive motion. Bell Dep., Exhibit 5. In that letter, Shepp indicated that it would be

prudent for CESD to minimize its employees' exposure to the EMFs so much as was possible for liability reasons. *Id.* More importantly, however, Shepp voiced her concerns about the need for repetitive, uninterrupted hand and arm motions in Plaintiff's workplace. *Id.* Plaintiff brought the substance of the letter to Bell's attention, yet Bell did not take any steps at that time to reduce Plaintiff's remagnetizing duties. Ridge Dep. at 72–73.

Then a few months later, in February of 1996, Plaintiff sought medical treatment for shoulder pain. Bell Dep., Exhibit 8. After a medical examination, Plaintiff was given a medical note recommending that she avoid repetitive motions with her shoulder for two weeks. *Id.* As a result, Bell took Plaintiff off remagnetizing duty for a two-week period. Ridge Dep. at 128.

Thereafter, in April of 1996, Bell conducted evaluations of the library support staff, including an evaluation of Plaintiff. Bell Dep. at 70–71. This was the first time that Bell had ever conducted support staff evaluations, and Bell's evaluation of Plaintiff was generally negative. *Id.* However, the other two library support staff personnel whom Bell evaluated received the highest ratings in all categories. Plaintiff's Statement of Material Facts ¶ 46. With respect to Plaintiff's evaluation, Bell indicated that although Plaintiff "was well qualified for her job and accurately completes most tasks required of her," she needed to develop the "skills that [would] help her become a team player." Bell's Dep., Exhibit 10. Additionally, Bell, without informing Plaintiff, indicated in Plaintiff's evaluation form information that Plaintiff did not take the evaluation seriously. Plaintiff's Statement of Material Facts ¶ 47; Bell Dep., Exhibit 10. Plaintiff disagreed so strongly with Bell's assessment of her job performance that she refused to sign the evaluation form. Bell Dep., Exhibit 10.

About a month later, another incident between Plaintiff and Bell occurred. Specifically, on May 29, 1996, Bell assigned Plaintiff to work an extra shift in the CEHS library. Plaintiff's Statement of Material Facts ¶¶ 48, 49. Bell had also left a list of tasks to be done by Plaintiff during this shift; this was unusual in that Bell had never given any other full-time education technicians written assignments before. *Id.* at ¶ 49. Plaintiff did not complete all of the assigned work because she had spent some time that evening assisting a student in the library. Ridge Dep. at 104. The next day, however, when Bell inquired of Plaintiff as to the amount of work that she had completed, there was an exchange of words between the two individuals, and Plaintiff, who had become upset, left the library. *Id.* Following this latest incident, on June 7, 1996, Bell wrote a letter to Principal DiFusco concerning her ongoing issues with Plaintiff. Bell Dep., Exhibit 2. In particular, Bell outlined the troubles in her relationship with Plaintiff, and ended her letter to Principal DiFusco with the conclusion that her "ability to manage the library effectively" was being substantially affected. *Id.* Furthermore, Bell requested that CESD resolve the matter. *Id.*

On June 20, 1996, another meeting was held among Superintendent Goldman, Plaintiff and two other school teachers; notably, Principal DiFusco and Bell were not present. Goldman Dep. at 52–53. During this meeting, the deteriorating situation between Bell and Plaintiff was discussed. *Id.* Later that same day, Goldman sent Plaintiff a letter summarizing, in her opinion, the content of the meeting. Bell Dep., Exhibit 4. In particular, Goldman's letter indicated to Plaintiff that the CEHS library was being "negatively impacted" as a result of the "pattern of interpersonal conflict" between Bell and Plaintiff. *Id.* Moreover, Goldman wrote that Plaintiff should consider a job change if a position should become available over the summer, and that, if no transfer option became available, the possibility of dismissal existed. *Id.*

In July of 1996, Cynthia Mowles took over the position of Superintendent of CESD. Mowles Aff. ¶ 1 (Docket No. 11).[1] Upon assuming the position, Mowles became aware of the situation between Plaintiff and Bell. *Id.* at ¶ 2. Because Mowles believed the situation needed to be addressed immediately, she met with Plaintiff, Bell, and Principal DiFusco on July 29, 1996. *Id.* at ¶ 3. Following this meeting, Mowles sent Plaintiff a letter indicating that she could see no other "viable alternative" to the situation in the CEHS library than to terminate Plaintiff's services. *Id.* at ¶ 6; Mowles Aff., Exhibit A. Consequently, on August 16, 1996, Mowles terminated Plaintiff's employment. Mowles Aff., Exhibit A.

## II. DISCUSSION

Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c). Once the moving party has come forward identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any" which "it believes demonstrate the absence of a genuine issue of material fact," the adverse party may avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2551–52, 91 L.Ed.2d 265 (1986).

The trial court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir.1990). The court will not, however, pay heed to "conclusory allegations, improbable inferences [or] unsupported speculation." *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990). If no genuine issue of material fact emerges, then the motion for summary judgment may be granted.

### A. *Count I: The ADA*

Congress enacted the ADA to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). In furtherance of this mandate, the ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

■ Under the ADA, to succeed on a discrimination claim a plaintiff must prove: (1) that she was disabled within the meaning of the ADA; (2) that she was able to perform the meaningful functions of her job, either with or without reasonable accommodation; and (3) that her employer terminated her in whole or in part because of her disability. *See Katz v. City Metal Co.,* 87 F.3d 26, 30 (1st Cir.1996). If the plaintiff cannot prove her case directly, she may do so indirectly by "using the *prima facie* case and burden shifting methods that originated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) [and its progeny]." *Id.* at 30 n. 2. This means that the plaintiff has the burden of presenting a *prima facie* case of discrimination, proving by a preponderance of the evidence, that she:

(i) has a disability within the meaning of the Act; (ii) is qualified to perform the

---

**1.** Despite Plaintiff's objection to the contrary, the Court finds that the affidavit of CESD Superintendent Cynthia Mowles is "made on personal knowledge, [sets] forth such facts as would be admissible in evidence, and [shows] affirmatively" that Mowles is competent to testify to the matters stated therein. *See* Fed. R.Civ.P. 56(e). Thus, the Court will consider Mowles' affidavit as evidence in the present matter.

**156**

essential functions of the job, with or without reasonable accommodations; (iii) was subject to an adverse employment action by a company subject to the Act; (iv) was replaced by a non-disabled person or was treated less favorably than non-disabled employees; and (v) suffered damages as a result. *Jacques v. Clean–Up Group, Inc.*, 96 F.3d 506, 511 (1st Cir.1996). The defendant then must offer a legitimate nondiscriminatory reason for the negative employment action. *Watkins v. J & S Oil Co.*, 977 F.Supp. 520, 524 (D.Me.1997), *aff'd*, 164 F.3d 55 (1st Cir.1998). Finally, the plaintiff has the opportunity and the burden of proving that the defendant's "proffered reason is merely a pretext for disability discrimination." *Hodgens v. General Dynamics Corp.*, 963 F.Supp. 102, 107 (D.R.I. 1997), *aff'd on other grounds*, 144 F.3d 151 (1st Cir.1998). Here, Count I of Plaintiff's Amended Complaint alleges that CESD violated the ADA by discriminating against her in two ways: (1) on the basis of an actual disability; and (2) on the basis of a perceived disability. CESD has moved for summary judgment with respect to both of these claims. The Court, therefore, will address each claim in turn.

### 1. *Actual disability*

#### (i) Plaintiff's *prima facie* case

■ CESD argues that it is entitled to summary judgment with respect to Plaintiff's actual disability claim because, under the ADA, Plaintiff is not, in fact, disabled. CESD argues that although Plaintiff may be physically impaired as a result of her shoulder tendonitis, she is not substantially limited in any major life activity. Specifically, CESD maintains that "heavy lifting" and performing "repetitive motion tasks" are not considered "major life activities" within the meaning of the ADA. Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law p. 9. Therefore, CESD argues, Plaintiff cannot establish her *prima facie* case of actual disability discrimination. *Id.*

Plaintiff argues in opposition that lifting and performing repetitive motion tasks are considered major life activities under the ADA. Therefore, Plaintiff maintains that she has established a *prima facie* case of discrimination, and the Motion for Summary Judgment must be denied. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment p. 10.

■ It is well-established that if an individual is not "disabled" within the meaning of the ADA, then the ADA does not protect that person against discrimination on the basis of his or her disability. *Arnold v. United Parcel Service, Inc.*, 136 F.3d 854, 858–59 (1st Cir.1998). The ADA defines a "disability" as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) having a record of such an impairment; or (C) being regarded as having such an impairment. *Id.; see* 42 U.S.C. § 12102(2). Because, for present purposes, Plaintiff's claim is based on an actual disability, the Court is concerned only with the first prong of the definition.

A disability under subsection (A) turns on three requirements: (1) a physical or mental impairment, that (2) "substantially limits," one of the plaintiff's (3) "major life activities." 42 U.S.C. § 12102(2)(A); *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 15 (1st Cir.1997). Plaintiff has been diagnosed by her treating physician, Dr. Shepp, with recurrent activity-related tendonitis in her right shoulder. Plaintiff's Statement of Material Facts ¶ 30; Shepp Dep. at 40. Therefore, for purposes of addressing CESD's Motion for Summary Judgment, the Court will assume, without deciding, that tendonitis of the shoulder constitutes a physical impairment under the ADA. *See DePaoli v. Abbott Laboratories*, 140 F.3d 668, 672 (7th Cir.1998) (court assumed tendonitis physical impairment for purposes of summary judgment); *see also Quint v. A.E. Staley Manufacturing Co.*, 172 F.3d 1, 11 (1st Cir.1999),

*petition for cert. filed,* (U.S. June 21, 1999) (No. 98–9984). Based on this assumption, Plaintiff has met the first requirement for a disability under 42 U.S.C. § 12102(2)(A).

The fact, however, that Plaintiff suffers from a physical impairment alone does not make her disabled under the ADA. *See Soileau,* 105 F.3d at 15. Indeed, for Plaintiff to be disabled under the ADA, her shoulder tendonitis must substantially interfere with a major life activity. *Id.* Plaintiff contends that her tendonitis interferes with her ability to do "heavy lifting" and "repetitive motion tasks," and that these two functions qualify as major life activities. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment p. 8–10 (Docket No. 13). For the following reasons, the Court agrees with Plaintiff that lifting is a major life activity under the ADA.

"Major life activities" are defined by the ADA implementing regulations as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(h)(2)(i). The ADA definition of major life activities, however, is not exhaustive. *See Bragdon v. Abbott,* 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998); 29 C.F.R. § 1630.2(i). Indeed, 29 C.F.R. Pt. 1630, App. § 1630.2(i), provides in relevant part:

> "Major life activities" are those basic activities that the average person in the general population can perform with little or no difficulty. Major life activities include caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. This list is not exhaustive. *For example, other major life activities include, but are not limited to . . . lifting . . . .* (Emphasis added).

Although the issue of whether lifting is a major life activity under the ADA has not been settled within this jurisdiction, the Court of Appeals for the First Circuit has alluded to the propriety of considering lifting as constituting a major life activity for purposes of supporting a disability claim. *See Quint,* 172 F.3d at 10 (29 C.F.R. Pt. 1630, App. § 1630.2(i)(expressly identifies lifting as major life activity)); *see also Cruz v. McAllister Bros., Inc.,* 52 F.Supp.2d 269, 280 (D.P.R.1999) (noting that in "some cases, lifting itself may be a major life activity"). Moreover, courts in other jurisdictions have expressly recognized lifting as a major life activity under the ADA. *See, e.g., Gutridge v. Clure,* 153 F.3d 898, 901 (8th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1758, 143 L.Ed.2d 790 (1999); *Helfter v. United Parcel Serv., Inc.,* 115 F.3d 613, 616 (8th Cir. 1997); *Thompson v. Holy Family Hosp.,* 121 F.3d 537, 539 (9th Cir.1997); *Ray v. Glidden Co.,* 85 F.3d 227, 229 (5th Cir. 1996). In light of the express language of 29 C.F.R. Pt. 1630, App. § 1630.2(i), together with both the supporting and persuasive decisions in this circuit and elsewhere, this Court finds that lifting is a major life activity under the ADA. Accordingly, Plaintiff has made out a *prima facie* case of actual disability discrimination.[2]

**(ii) CESD's legitimate, nondiscriminatory reason**

Having found that Plaintiff has established her *prima facie* case of discrimination, pursuant to the *McDonnell Douglas* framework, a presumption of discrimination has risen. The Court must now examine whether Plaintiff's evidence is sufficient to survive summary judgment on the remaining two prongs of the *McDonnell Douglas* test; for once a plaintiff has established a *prima facie* case of discrimination, the burden of production shifts to the defendant, who must point to evidence in-

**2.** Under the *McDonnell Douglas* three-prong test, Plaintiff must also demonstrate that her major life activity of lifting has been "substantially impaired" by her physical disability. There is, however, sufficient evidence before the Court, for purposes of the present Motion for Summary Judgment, that could support a finding that Plaintiff's shoulder tendonitis substantially impaired her major life activity of lifting. *See, e.g.,* Shepp Dep. at 40–44.

dicating that there existed a legitimate, nondiscriminatory reason for the complained-of action. *See Dichner v. Liberty Travel*, 141 F.3d 24, 30 (1st Cir.1998). A defendant meets this burden by proffering admissible evidence of an explanation that would be legally sufficient to justify a judgment for the defendant. The defendant need not persuade the trier of fact that there was no intentional discrimination; it need only produce evidence on that point. *See id.; see also St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506–08, 113 S.Ct. 2742, 2747–48, 125 L.Ed.2d 407 (1993). Then, if the defendant meets its burden, the plaintiff must show that there is sufficient potential proof for a reasonable jury to find the defendant's proffered reason a mere pretext for impermissible discrimination. *See Dichner*, 141 F.3d at 30.

CESD argues Plaintiff was terminated as a result of her inability to accept constructive criticism and work productively with her supervisor. *See* Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law p. 13. Consequently, CESD argues it is entitled to summary judgment because it has presented a legitimate, nondiscriminatory reason for its termination of Plaintiff's employment. *Id.*

Plaintiff argues that an individual's inability to work with others and accept criticism is not a sufficient, nondiscriminatory reason for termination. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment p. 12–15. As such, Plaintiff maintains CESD has failed to meet its burden of production and that the Motion for Summary Judgment must be denied. *Id.*

In the First Circuit, an employee's insubordination and failure to get along with both co-workers and supervisors in a setting which requires cohesive teamwork is a justification for the firing of that employee. *Ahmed v. Berkshire Medical Center, Inc.*, 1998 WL 157016, * 7 (D.Mass.1998); *see also Johnson v. Allyn & Bacon, Inc.*, 731

F.2d 64, 73 (1st Cir.1984) (inability to get along and cooperate with co-workers amounts to legitimate nondiscriminatory reason for termination), *cert. denied*, 469 U.S. 1018, 105 S.Ct. 433, 83 L.Ed.2d 359 (1984).

In the present action, CESD has offered ample evidence that Plaintiff was fired because of her inability to work productively with her supervisor, and that this situation was having a detrimental affect on the operation of the CEHS library. It is well documented from the evidence that the relationship between Plaintiff and Bell following the 1994 Christmas break was extremely contentious, *see* Bell Dep., Exhibit 2; Bell Dep., Exhibit 4; Bell Dep. at 24–27, Ridge Dep. at 36–40; Mowles Aff. at ¶¶ 2–6; Mowles Aff., Exhibit A, and that the breakdown of Plaintiff's and Bell's working relationship was seriously affecting the daily operation of the CEHS library. *See* Mowles Aff. ¶¶ 2–6; Mowles Aff., Exhibit A; Bell Dep., Exhibit 2; Bell Dep., Exhibit 4.

In addition, both Superintendents Goldman and Mowles expressed their concern that Plaintiff was not able to interact and cooperate with Bell, and that Plaintiff refused to recognize that she was the cause of some of the problem. *See* Bell Dep., Exhibit 4; Mowles Aff., Exhibit A. In particular, Mowles stated that upon taking the position of Superintendent of CESD, she "discovered that a serious personnel issue existed between members of the staff working in the school library." Mowles Aff. ¶ 2. As a result of this discovery, Mowles held a meeting with Plaintiff, among others, to address the situation. *Id.* at ¶ 3. Following this meeting, Mowles summarized her thoughts on the situation as follows:

> [I was] struck by the fact that ... [Plaintiff] did not acknowledge the existence of any problem that was attributable to her conduct. [Plaintiff] said that she was willing to work to make things better, but it appeared to me that, de-

spite the length of time that the problems had persisted, [Plaintiff] had never come to recognize the seriousness of the situation. [Plaintiff] also did not seem to understand just how disruptive her inability to relate well with her supervisor [was] to the effectiveness of the library's operations. Mowles Aff. ¶ 5.

Based upon the foregoing observations, Mowles concluded that she had no other viable alternative but to terminate Plaintiff's employment with CESD. Mowles Aff. ¶ 6; Mowles Aff., Exhibit A. For the foregoing reasons, the Court concludes that CESD has offered admissible evidence of a legitimate, nondiscriminatory reason for Plaintiff's termination.

### (iii) Pretext

■ Once the defendant satisfies the burden of presenting a nondiscriminatory reason for the adverse employment decision, the presumption of discrimination established by the plaintiff's *prima facie* case dissolves. *See Dichner,* 141 F.3d at 30; *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 255 n. 10, 101 S.Ct. 1089, 1095 n. 10, 67 L.Ed.2d 207 (1981). At this point, the plaintiff must produce evidence, unaided by the original inference created by her *prima facie* case, that the defendant's proffered reason is a mere pretext, the real reason for her termination having been based on an impermissible animus directed toward her because of her disability. *See Dichner,* 141 F.3d at 30. In the First Circuit, the ultimate burden of proof of intentional discrimination rests at all times on the plaintiff; it is "insufficient for a plaintiff merely to undermine the veracity of the employer's proffered justification," and the plaintiff is required to show both that the employer's articulated reason is false and that discrimination was the actual reason for the employment action. *Id.*

"Where a plaintiff in a discrimination case makes out a *prima facie* case and the issue becomes whether the employer's stated nondiscriminatory reason is a pre-text for discrimination, courts must be 'particularly cautious' about granting the employer's motion for summary judgment." *Hodgens v. General Dynamics Corp.,* 144 F.3d at 167 (citing *Stepanischen v. Merchants Despatch Transp. Corp.,* 722 F.2d 922, 928 (1st Cir.1983)). Summary judgment is not, however, automatically precluded even in cases where motive or intent is at issue. *Id.* If a plaintiff in a discrimination action rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation," summary judgment may be appropriate even where intent is an issue. *Id.* (quoting *Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 12 (1st Cir.1994), *cert. denied,* 514 U.S. 1108, 115 S.Ct. 1958, 131 L.Ed.2d 850 (1995)). The role of the trial judge at the summary judgment stage "is not ... to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *See id.* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)). With these principles to guide it, the Court turns to the question of whether Plaintiff has submitted evidence strong enough to create "a sufficient disagreement to require submission to a jury" of the issue of whether CESD's explanation for Plaintiff's termination is a pretext for discrimination. *See id.*

■ Plaintiff argues that there is "dramatic evidence" that CESD terminated Plaintiff's employment because of her shoulder disability and that this evidence is as follows: (1) Plaintiff successfully performed her work; (2) Plaintiff was not put on warning of her impending termination; (3) CESD did not investigate or intervene in the situation between Bell and Plaintiff; (4) CESD violated its own rules and procedures; and (5) Bell "was out to get" Plaintiff because she didn't fit the image of a librarian. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for

Summary Judgment p. 16.[3]

First, with regard to Plaintiff's proffered evidence of discriminatory animus, there is no dispute that Plaintiff successfully performed most of her duties in the CEHS library. *See* Bell's Dep., Exhibit 10. It is also undisputed that Bell, although Plaintiff's supervisor, never personally warned Plaintiff that she risked termination. Plaintiff's Statement of Material Facts ¶ 42; Defendant's Reply Statement of Material Facts ¶ 42. Moreover, CESD does not dispute that progressive discipline procedures should be followed in cases where an employee's job is at risk, or that CESD should be careful and responsible before terminating employees. *See* Plaintiff's Statement of Material Facts ¶¶ 58, 83; Defendant's Reply Statement of Material Facts ¶¶ 58, 83. Finally, although disputed by CESD, when the evidence is viewed in a light most favorable to Plaintiff as the nonmoving party, it appears that CESD did not follow any specific, detailed course of progressive disciplinary procedure with respect to Plaintiff prior to her termination. Plaintiff's Statement of Material Facts ¶¶ 59, 61, 64, 67, 72.

Nevertheless, contrary to Plaintiff's argument of pretext, the foregoing evidence does not demonstrate any connection between the reason for Plaintiff's termination and her shoulder disability. Plaintiff's evidence, although possibly supportive of a finding that Plaintiff may not have been terminated with all due care, does not demonstrate how CESD's stated legitimate reason for her termination was based upon anything else but Plaintiff's failure to work cooperatively with her supervisor, Bell. Moreover, although the evidence shows that Bell was aware of Plaintiff's shoulder tendonitis in November of 1995, *see* Bell Dep. at 56, Plaintiff has presented no evidence that Bell fabricated her troubles with Plaintiff in order to have her terminated because of her disability.

Alternatively, although not argued by Plaintiff in her opposition memorandum, the Court has also considered the following evidence which could possibly support a finding of pretext on Defendant's part. Specifically, Plaintiff claims that in February 1996, she provided Bell with a doctor's letter indicating that she should refrain from remagnetizing work for a two-week period; and "at the same time these restrictions were presented, Ms. Bell discussed with [Plaintiff] that she might want to transfer to another job." Plaintiff's Statement of Material Facts ¶ 44. Plaintiff's statement, if true, would possibly constitute evidence of a discriminatory animus.

In her deposition, Bell stated that Plaintiff had presented her with a medical note in February of 1996 which indicated that Plaintiff, because of her shoulder, should be relieved from repetitive movements at work for a one-to-two-week period. Bell Dep. at 61. And in fact, in response to this medical note, Bell took Plaintiff off remagnetizing duty in the library for a two-week period. *Id.* More importantly, however, the evidence clearly indicates that it was not Bell who inquired as to whether Plaintiff should transfer to another job, *but rather, that it was Plaintiff, herself, who brought up the topic of a transfer. Id.* at 62. Unquestionably, therefore, when the actual evidence before the Court is compared with Plaintiff's characterization of Bell's testimony, the inference of discrimination is dispelled entirely.

Also, Plaintiff states that as of September 1995, "[Plaintiff] was told by Ms. Bell that she would be the only person doing the remagnetizing of library books despite the fact that this bothered her arms." Plaintiff's Statement of Material Facts

---

**3.** The Court notes that although Plaintiff carries the burden of proof with regard to the demonstration of pretext, Plaintiff has failed to reference even a single record citation to support her legal argument that CESD's stated reason for Plaintiff's termination was pretextual.

¶ 98. Again, were this statement to be supported by the evidence, an inference of a discriminatory animus could be drawn on the part of Bell towards Plaintiff; but upon closer review, Plaintiff's assertion in her Statement of Material Facts is not supported factually by the evidence.

First, contrary to Plaintiff's Statement of Material Facts, nowhere in Plaintiff's deposition is there evidence that Plaintiff "was told" by Bell that she would be the only person doing the remagnetizing of library books. Ridge Dep. at 69. Instead, Plaintiff testified in her deposition that prior to September 1995, books were remagnetized by herself, volunteers, Bell, and "extra subs" when they were on hand. *Id.* But then, in September of 1995, Plaintiff began to be the only person to do the remagnetizing work, and she felt that this type of work was dangerous because of "electromagnetic field issues." *Id.* Most importantly, however, there is no evidence to suggest why Plaintiff was the only person doing this type of work in September of 1995.

Moreover, there is nothing in the evidence to indicate that Bell in September of 1995 was even aware that the repetitive motion of remagnetizing books bothered Plaintiff's arms. Plaintiff's testimony in her deposition concerning this time period was that the remagnetizing of "truckloads" of books *"was beginning* to bother [her] arms," not that Bell was aware that the remagnetizing was affecting Plaintiff. Ridge Dep. at 69. (Emphasis added). In fact, Plaintiff herself indicated in her Statement of Material Facts that Bell first became aware of Plaintiff's shoulder difficulties in November of 1995, two months after Plaintiff supposedly was told by Bell that she would be the only person remagnetizing the library books. Plaintiff's Statement of Material Facts ¶ 43; Bell Dep. at 56. Consequently, there is no evidentiary basis for the Court to find that

Bell had a discriminatory animus toward Plaintiff on the basis of her shoulder disability in September of 1995, when the evidence shows that Bell was unaware of Plaintiff's shoulder condition until two months later.

▮ Finally, Plaintiff asserts that even after she gave Bell a medical note in November of 1995 with regard to the remagnetizing work, and Bell became aware of Plaintiff's shoulder disability, Bell never asked Plaintiff if she needed a break from remagnetizing or reduced Plaintiff's remagnetizing workload. Plaintiff's Statement of Material Facts ¶¶ 99–100; Ridge Dep. at 71–73. The pertinent paragraph [4] of the medical note, for purposes of the Court's analysis here, provides as follows:

I [Dr. Shepp] am more concerned about the need for repetitive uninterrupted hand and arms motions. [Plaintiff] has already experienced some shoulder pain while performing her tasks, *and while there has been no more serious consequences so far,* we are frequently seeing shoulder, elbow and wrist injuries in patients who are required to perform repetitive hand and arm motions.

Bell Dep., Exhibit 5 (Emphasis added).

Although the medical note does indicate that Plaintiff was experiencing some shoulder pain while performing her library tasks, the note states that "so far," Plaintiff was not suffering from any serious consequences as a result of these functions. *Id.* Also, the medical note does not specifically indicate that Plaintiff was required to refrain altogether from doing any particular library task. *Id.* The medical note merely voices Dr. Shepp's concerns about the need for "uninterrupted hand and arm motions" in the library, and makes the general observation that people who perform repetitive motions suffer injuries. *Id.* In light of this evidence, it cannot be fairly said that Bell purposely

---

**4.** The medical note is primarily concerned with the relationship of electromagnetic fields

to human contact. Bell Dep., Exhibit 5.

discriminated against Plaintiff by requiring that she continue to do the remagnetizing work.

For the foregoing reasons, the Court finds that Plaintiff has not presented anything but "conclusory allegations, improbable inferences, and unsupported speculation," in support of her claim that Defendant's stated reason for her termination was merely a pretext for a true discriminatory animus. *See Hodgens,* 144 F.3d at 167 (citations omitted).[5] As such, Plaintiff has failed to carry her burden with regard to her actual disability discrimination claim.

### 2. *Plaintiff's "perceived" disability*

Plaintiff further claims that CESD violated the ADA by perceiving her obesity as a disability. "Persons who do not have a disability within the meaning of the ADA may still qualify for its protection if they are regarded by the employer as having such an impairment." *Santiago v. Executive Airlines,* 41 F.Supp.2d 129, 136 (D.P.R.1999). This occurs when an individual who is not actually impaired is treated as if she were so in her place of employment. *Id.; Cook v. State of R.I., Dept. of MHRH,* 10 F.3d 17 (1st Cir.1993).

As discussed above, under the ADA, a "disability" is defined as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) having a record of such an impairment; or (C) being regarded as having such an impairment. *See* 42 U.S.C. § 12102(2). The purpose of subsection (C) is to protect impaired individuals from discrimination on the part of their employers who exclude such individuals because of the stereotypes, myths, and fears they hold of people who are so impaired. *See* 29 C.F.R. § 1630.2(1), App. Plaintiff, here, does not maintain that her obesity is an actual disability under the ADA. Rather, Plaintiff argues that CESD perceived her as disabled. Consequently, the Court is concerned only with subsection (C) of the definition.

To determine whether CESD regarded Plaintiff as disabled because she was obese, the Court's focus must be on the effect that Plaintiff's obesity had on CESD. *See Byrne v. Bd. of Ed., School of West Allis, West–Milwaukee,* 979 F.2d 560, 567 (7th Cir.1992). Plaintiff must show more than just that CESD believed she had an impairment. To prevail under subsection (C), Plaintiff must show that CESD perceived her as disabled in the sense that she had an impairment that substantially limited a major life activity. *See Soileau v. Guilford of Maine, Inc.,* 928 F.Supp. 37, 51 (D.Me.1996), *aff'd* 105 F.3d 12 (1st Cir. 1997).

Plaintiff, however, has failed to identify with any precision which major life activities CESD allegedly perceived her to be substantially limited in, thereby rendering the Court's analysis of this issue unnecessarily difficult. Nevertheless, the Court is able to discern two major life activities in which CESD may have perceived Plaintiff to be substantially limited: walking and working. The Court will examine each of these activities in turn.

#### (i) Walking

To determine whether CESD perceived Plaintiff's ability to walk to be substantially limited by her obesity, the Court turns to the ADA's implementing regulation that defines "substantially limits." Title 29 C.F.R. § 1630.2(j)(1) defines "substantially limits" as: (i) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to the condition, manner or duration under which an indi-

---

**5.** With regard to Plaintiff's argument that Bell was "out to get her" because she did·not fit the image of a librarian, this simply has nothing to do with the issue of whether CESD's reason for terminating Plaintiff was pretextual. Even assuming that Plaintiff's argument is true, and Bell did want Plaintiff terminated because she believed that Plaintiff did not "fit the image" of a librarian, Bell's motive, although unfortunate, simply has no connection to Plaintiff's shoulder disability or a claim under the ADA.

vidual can perform a major life activity as compared with the condition, manner, or duration under which the average person in the general population can perform that same major life activity. *See also Bilodeau v. Mega Industries,* 50 F.Supp.2d 27, 34–35 (D.Me.1999). Moreover, Title 29 C.F.R. § 1630.2(j)(2) lists the following factors to be considered in determining whether a person is substantially limited in a major life activity: (i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long-term impact or the expected permanent or long-term impact of or resulting from the impairment. *See Quint,* 172 F.3d at 5.

■ Plaintiff's evidence in support of her argument that CESD perceived her obesity as a disability is as follows: (1) Bell put up an article on "librarianism" in the CEHS library (Plaintiff's Statement of Material Facts ¶ 90)[6]; (2) Plaintiff and Bell discussed breast reduction surgery in the fall of 1994 (*Id.* at ¶ 91); (3) Bell asked Plaintiff on one occasion if she could fit under a table to unplug a computer (*Id.* at ¶ 92); (4) Bell made sugarless candy for Plaintiff at Christmas in 1994 (*Id.* at ¶ 93); (5) Bell asked Plaintiff if she could handle all the walking required in the expanded library (*Id.* at ¶ 94); and (6) Bell made numerous comments about the weight of teachers and students (*Id.* at ¶ 121). Of the foregoing evidence, only Bell's inquiry into whether Plaintiff could handle all the walking required in the expanded library truly has any relevance to the issue of CESD's perception that Plaintiff, as a re-sult of her obesity, was substantially limited in her major life activity of walking.

As to this issue, the evidence indicates that Bell raised her concern over Plaintiff's walking ability only once, on an afternoon in the spring of 1995. Ridge Dep. at 117–119; Plaintiff's Statement of Material Facts ¶ 112. The evidence also shows that Plaintiff told Bell that she would be able to do the increased walking in the expanded library, *id.,* at 119, and there is no evidence that Bell disbelieved Plaintiff's response or that Bell ever broached the issue again. Finally, the evidence shows that Plaintiff was terminated from her position on August 16, 1996, well over one year from the time that Bell made her isolated inquiry into Plaintiff's walking ability. Mowles Aff., Exhibit A. Thus, based upon the foregoing, it is not reasonable for the Court to conclude that Bell perceived Plaintiff's obesity to be a substantial limitation on her major life activity of walking.

With regard to Plaintiff's and Bell's conversation regarding breast reduction surgery, it is clear from the evidence that it was Plaintiff, and not Bell, who raised the issue. Ridge Dep. at 30–31. Furthermore, Plaintiff, herself, characterizes this discussion with Bell as "just a conversation." *Id.* at 31. Thus, the foregoing is not evidence of any perceived disability discrimination on the part of Bell.

■ Additionally, the evidence that Bell made Plaintiff sugarless candy, that Bell frequently commented on Plaintiff's and other people's weight, and that Bell asked if Plaintiff could fit under a table, does not advance Plaintiff's claim that

---

6. The "librarianism" article appears to be a guideline for individuals who wish to draw illustrations for a "librarianism" magazine. Ridge Dep. at 29; Ridge Dep., Exhibit 1. In that article, the authors state that "all publications today want to avoid sexism, racism, and ageism in illustrations as well as in text.... Most librarians are modern-looking, modern-thinking, service oriented professionals who strongly favor equal opportunities for all. These guidelines should help you prepare illustrations that will edify and delight our readers: ... 3. Librarians should never be depicted as spinsters or 'little old ladies.' Male librarians do not ordinarily wear bow ties. Exaggerated breasts and buttocks, shushing fingers, and SILENCE signs are unacceptable in *American Libraries.*" Ridge Dep., Exhibit 1. The Court fails to comprehend how this article supports Plaintiff's claim that CESD perceived Plaintiff, as a result of her obesity, to be substantially limited in her major life activity of walking.

CESD perceived her to be substantially limited in her major life activity of walking. *See* Ridge Dep. at 33, 119, 132. This evidence, at best, is indicative only of Bell's purported belief that Plaintiff was obese; yet a "disparaging remark about [a person's] size does not equate with treatment of her size as impairing one of her major life activities." *Walton v. Mental Health Assoc. of Southeastern Pennsylvania,* 1997 WL 717053, *15 (E.D.Pa.1997), *aff'd,* 168 F.3d 661 (3rd Cir.1999).[7]

Therefore, in light of the nature of Plaintiff's obesity, the remoteness in time of Plaintiff's termination to the inquiries and general comments of Bell, and Plaintiff's responses to Bell's questions and comments, there is no basis for Plaintiff's claim that CESD perceived her to be substantially limited in her major life activity of walking.

### (ii) Working

■■■■ Turning now to whether CESD perceived Plaintiff's obesity as substantially limiting her major life activity of working, it is well-established that an ADA claimant assumes a more "fact-specific burden of proof in attempting to demonstrate that her impairment 'substantially limits' the major life activity of 'working.'" *Quint,* 172 F.3d at 11. An impairment does not substantially limit the ability to work unless the impairment significantly restricts the employee in her ability to perform either a class of jobs, or a broad range of jobs in various classes, as compared with the average person having comparable training, skills and abilities. *Id.;* 29 C.F.R. § 1630.2(j)(3)(i). The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working. 29 C.F.R. § 1630.2(j)(3)(i). "The proper test is whether the impairment, as perceived, would affect the individual's ability to find work across the spectrum of same or similar jobs." *Soileau,* 928 F.Supp. at 51 (cit-

ing cases). Therefore, to survive summary judgment at this stage, a plaintiff must present evidence sufficient to show that the defendant regarded her as incapable of working generally, rather than of performing certain functions, as discussed above, because an impairment that disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one. *See Soileau,* 928 F.Supp. at 51 (finding that even if employer considered employee incapable of performing certain functions, that alone would not be actionable under the ADA).

Plaintiff has pointed to no evidence that CESD regarded her as being incapable of working generally in a broad range of jobs because of her obesity. Plaintiff's only evidence that even touches on this issue relates to CESD's possible perception that Plaintiff was limited in her ability to work in a broad range of jobs because of her shoulder disability. Specifically, in her deposition, Superintendent Goldman stated that she felt that Plaintiff would not be able to take a position in the Pond School Library because she "[did not] think [Plaintiff] could do that job because it [required] lifting ...." Ridge Dep. at 109. Although this evidence arguably relates to CESD's perception that Plaintiff could not perform other jobs because of her shoulder disability, the evidence has no bearing whatsoever on Plaintiff's claim that CESD perceived her to be substantially limited in her major life activity of working *because she was obese.* As such, Plaintiff has failed to meet her burden with respect to her perceived disability claim, and under the first prong of the *McDonnell Douglas* shifting-burden test, CESD is entitled to summary judgment.

### B. *Count II: The ADEA*

■■■ In Count II of her Amended Complaint, Plaintiff alleges that CESD discriminated against her because of her age in

---

7. The Court also notes that the evidence shows that Plaintiff is not morbidly obese. *See* Shepp Dep., Exhibit 1; *cf. Cook,* 10 F.3d at 25 (plaintiff's morbid obesity substantially limited major life activity of walking).

violation of the ADEA. In wrongful discharge actions based upon the ADEA, the plaintiff bears the ultimate burden of proving that, but for her age, she would not have been fired. *Jimenez v. Bancomercio de Puerto Rico,* 174 F.3d 36, 40 (1st Cir. 1999). Where direct evidence of discrimination is lacking, a plaintiff's ADEA claim is governed by the *McDonnell Douglas* burden-shifting framework. *Jimenez,* 174 F.3d at 40–41.

■ Here, under *McDonnell Douglas,* Plaintiff must first present a *prima facie* case of age discrimination, which requires that she show: (1) she was a member of a protected age group, *i.e.,* at least 40 years old; (2) she was meeting CESD's legitimate job expectations; (3) she was fired; and (4) CESD had a continuing need for the same services, and they subsequently were performed by an individual with the same or similar qualifications as Plaintiff. *See Brennan v. GTE Government Systems Corp.,* 150 F.3d 21, 26 (1st Cir.1998). Once Plaintiff has met this burden, a presumption of discrimination attaches, and CESD must put forth a legitimate, nondiscriminatory reason for firing her. *Id.* Then if CESD does so, Plaintiff is required to show by a preponderance of the evidence that CESD's stated reason for termination was merely a pretext and that the true reason was the age-based animus. *Jimenez,* 174 F.3d at 41.

CESD does not dispute that Plaintiff can satisfy three of the four prongs of the *prima facie* case for age discrimination.[8] CESD does argue, however, that Plaintiff cannot establish that she was performing her job up to the level it expected because Plaintiff was unable to work cooperatively with her supervisor. *See* Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law p. 15.

Upon review of the evidence, the Court will assume for purposes of the present Motion for Summary Judgment, that Plaintiff is able to satisfy her ADEA *prima facie* case. *See Tucker v. Kingsbury Corp.,* 929 F.Supp. 50, 54 (D.N.H.1996) (court assumed for purposes of summary judgment that Plaintiff met ADEA *prima facie* case). In particular, Plaintiff has offered evidence that she performed the technical, everyday functions of her position in a competent manner. Bell Dep., Exhibit 10 (Bell stated in Plaintiff's performance review that she was "clearly academically qualified to do her job," and that she "accurately completes most tasks required of her"). Consequently, for purposes of the present motion, the Court will assume that Plaintiff has established her *prima facie* case by putting forth sufficient evidence that she met CESD's legitimate job expectations in the performance of her position.

Also, as the Court has already discussed, CESD terminated Plaintiff's employment because Plaintiff and her supervisor were unable to work together cooperatively. *See* Mowles Aff., Exhibit A; Bell Dep., Exhibit 4; *see also Ahmed,* 1998 WL 157016, * 7 (individual's inability to be productive member of workplace may constitute failure to meet employer's legitimate job expectations). Therefore, for the same reasons as stated above, the Court again finds that CESD has set forth a legitimate, nondiscriminatory reason for Plaintiff's dismissal. With the foregoing assumption and finding established, the burden now falls on Plaintiff to demonstrate that CESD's proffered reason for her termination was pretextual, and that the true reason for her dismissal was CESD's age-based animus. *Jimenez,* 174 F.3d at 41.

■ Plaintiff offers the following evidence in support of her claim that CESD's proffered reason for her termination was

---

8. Defendant does not dispute that: (1) Plaintiff is a member of the protected class; (2) Plaintiff was terminated from her position; and (3) Plaintiff was replaced by a younger individual. *See* Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law p. 15.

pretextual: (1) Bell inquired of Plaintiff as to whether Plaintiff could handle all the walking in the library, Ridge Dep. at 34; (2) Bell indicated that she was going to "trade" Plaintiff in for "two twenty-fivers," *id.* at 125; (3) Bell made repeated comments about the age of faculty, and their unwillingness to keep up, *id.* at 125–126; (4) Plaintiff found an advertisement for another school system in her mailbox, *id.* at 124; and (5) Bell made comments about a teacher who had retired, and the teacher was close in age to Plaintiff, *id.* at 126.

 Presently, the evidence, when viewed in a light most favorable to Plaintiff, shows that on one occasion in the fall of either 1993 or 1994, Bell made a comment to Plaintiff that she wanted to "trade" her in for "two twenty-fivers." Ridge Dep. at 125. It is well-established in the First Circuit, however, that stray comments are insufficient to meet the plaintiff's burden in an ADEA case. *Thomas v. Sears, Roebuck & Co.,* 144 F.3d 31, 34 (1st Cir.1998); *Ayala–Gerena v. Bristol Myers–Squibb Co.,* 95 F.3d 86, 96 (1st Cir.1996). Additionally, the evidence shows that Bell made the comment at least two years before Plaintiff was actually terminated. *See Birkbeck v. Marvel Lighting Corp.,* 30 F.3d 507, 512 (4th Cir.1994) (discriminatory comment made over two years from discharge date was not evidence of age discrimination), *cert. denied,* 513 U.S. 1058, 115 S.Ct. 666, 130 L.Ed.2d 600 (1994). Therefore, Bell's stray comment here is not evidence of any age-based discriminatory animus toward Plaintiff.

 Further, Plaintiff states in her deposition that in the Spring of 1996 she found an advertisement for a position in another school system in her mailbox. Ridge Dep. at 124. Plaintiff, however, has not presented any evidence as to who actually placed the advertisement in her mailbox; although Plaintiff believes it was Bell

because on the morning that she found the advertisement, Bell had asked Plaintiff to "go up and do something in the mail-room, which was very unusual for that time of morning . . . ." *Id.* at 124. Nonetheless, aside from the fact that there is no evidence linking the placing of the advertisement in Plaintiff's mailbox to CESD, even when the Court views this evidence in a light most favorable to Plaintiff, the Court finds that Plaintiff has failed to establish any nexus of age-based discrimination with the placement of the advertisement in her mailbox. The advertisement could have been left in Plaintiff's mailbox for any number of legitimate reasons, and there is no evidence before the Court that CESD placed the advertisement in Plaintiff's mailbox as a result of any age-based discriminatory animus.

 The evidence also shows that Bell spoke frequently "about the age of the [Cape Elizabeth] faculty," and their "not being interested in keeping up with the new technologies." Ridge Dep. at 125. Yet, in the First Circuit, "a criticism that someone is unable to change is not a coded allusion to cloaking age discrimination." *Thomas,* 144 F.3d at 34; *see also Mesnick v. General Elec. Co.,* 950 F.2d 816, 823 (1st Cir.1991), *cert. denied,* 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). Therefore, Bell's general observations with regard to the age of the school faculty and their inability to adapt to new technology is insufficient to support Plaintiff's claim of age discrimination.[9]

 Finally, Plaintiff states that Bell repeatedly asked Plaintiff if she "could handle all the walking that was going to be happening with the remodeled library," and that this inquiry is evidence of Bell's age-based discriminatory animus toward her. *Id.* at 34, 125–26. The facts, however, even when viewed favorably for the

---

9. Plaintiff also states that certain comments Bell made with respect to a retiring teacher were also directed at her because she was close in age to the teacher who had retired.

*Id.* at 126. But Plaintiff never indicates what Bell's comments were, and therefore, for obvious reasons, the Court will not consider this "evidence" any further.

Plaintiff, show that Bell asked Plaintiff if she could do all the required walking in the new library only once, and that Plaintiff told Bell that she would be able to do so once the library opened. *Id.* at 116–18; Plaintiff's Statement of Material Facts ¶ 112. Because there is nothing in this evidence to suggest that Bell disbelieved Plaintiff, or that Bell's inquiries factored into CESD's decision to terminate Plaintiff's employment, this evidence does little to demonstrate pretext on the part of CESD. *See* Mowles Aff., Exhibit A.

In light of the foregoing, the Court finds that Plaintiff has failed to meet her burden of demonstrating that CESD's stated reason for her termination was pretextual and that the real reason CESD terminated Plaintiff's employment was grounded upon any age-based discriminatory animus. Accordingly, under the third prong of the *McDonnell Douglas* shifting-burden test, CESD is entitled to summary judgment with respect to Plaintiff's ADEA claim.

C. *Count III: Sections 1981 & 1981a*

■ It is well-recognized that 42 U.S.C. § 1981 forbids racial discrimination in the making and enforcement of private contracts. *Patterson v. McLean Credit Union,* 491 U.S. 164, 171, 109 S.Ct. 2363, 2369, 105 L.Ed.2d 132 (1989). Here, Plaintiff has made no allegation that CESD discriminated against her on the basis of her race. Consequently, Plaintiff's claim under 42 U.S.C. § 1981 in Count III of the Amended Complaint is meritless.

Furthermore, 42 U.S.C. § 1981a is wholly dependent on other substantive Acts, such as the ADA and the ADEA. *See Presutti v. Felton Brush, Inc.,* 927 F.Supp. 545, 550 (D.N.H.1995). Section 1981a merely expands on the remedies available under these other substantive Acts, and so long as a claim under another substantive Act remains viable, so too does a plaintiff's claim pursuant to 42 U.S.C. § 1981a. *Id.* Because, here, Plaintiff's claims under the ADA and ADEA are not viable, Plaintiff's claim under 42 U.S.C. § 1981a must also fail.

D. *Count IV: The MHRA*

The ADA, and its state law analog, the MHRA, seek to root out discrimination against disabled individuals. *See* 42 U.S.C. § 12101(b)(1) (it is the purpose of the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities"); 5 M.R.S.A. § 4552 (the MHRA prohibits "discrimination in employment, housing or access to public accommodations on account of race, color, sex, physical or mental handicap"). "In analyzing the ADA and MHRA, the Court need not continuously distinguish between the two statutes as to their scope and general intent because Maine courts consistently look to federal law in interpreting state anti-discriminatory statutes." *Soileau v. Guilford of Maine, Inc.,* 928 F.Supp. at 45 (citing *Winston v. Maine Technical College Sys.,* 631 A.2d 70, 74–75 (Me.1993)). Similarly, it appropriate to "refer to federal law interpreting the ADEA" when analyzing an analogous claim under the MHRA. *French v. Bath Iron Works, Corp.,* 45 F.Supp.2d 69, 74 (D.Me.1999).

Here, the Court has found that CESD is entitled to summary judgment with respect to Plaintiff's disability claims under the ADA, and also as to Plaintiff's age discrimination claim under the ADEA. As a result, both Plaintiff's disability and age discrimination claims under the MHRA must also fail because interpretation of the ADA, the ADEA, and the MHRA proceed hand in hand. *Soileau,* 105 F.3d at 14; *French,* 45 F.Supp.2d at 74. Thus, the necessary conclusions as to Plaintiff's MHRA claims flow directly from the Court's ADA and ADEA analyses.

**III. CONCLUSION**

Caution is appropriate when considering summary judgment for an employer in a discrimination action, and for the purposes of this motion, the evidence and all reasonable factual inferences have been viewed in

the light most favorable to Plaintiff. To prevail on her discrimination claim under the ADA and the MHRA, Plaintiff must qualify as disabled as defined under the statutes and show that she was subject to an adverse employment action by CESD because she had a disability and that she suffered damages as a result. Plaintiff has submitted evidence on summary judgment from which a jury could infer that she was actually disabled under the first theory of disability under the ADA; conversely, CESD has produced evidence of a nondiscriminatory reason for Plaintiff's termination. Plaintiff, however, has failed to meet her burden of demonstrating that CESD's stated reason for her termination was pretextual; therefore, CESD, under the third prong of the *McDonnell Douglas* shifting-burden test, is entitled to summary judgment on Plaintiff's actual disability discrimination claims under the ADA and MHRA. As to Plaintiff's claims of perceived disability discrimination under the ADA and MHRA, Plaintiff has failed to meet her burden of establishing a *prima facie* case. Consequently, under the first prong of the *McDonnell Douglas* shifting-burden test, Defendant is entitled to summary judgment as to these two claims as well.

Additionally, the Court has assumed, for purposes of CESD's Motion for Summary Judgment, that Plaintiff has established a *prima facie* case of age discrimination under the ADEA, thereby satisfying the first prong of the *McDonnell Douglas* shifting-burden test. The Court has also found that CESD has produced evidence of a non-discriminatory reason for Plaintiff's termination. The Court, however, finds that Plaintiff has failed to meet her burden of demonstrating that CESD's stated reason for her termination was pretextual and based upon an age-based discriminatory animus. Therefore, CESD, under the third prong of the *McDonnell Douglas* shifting-burden test, is entitled to summary judgment as to Plaintiff's age discrimination claims under the ADEA and MHRA.

Finally, Plaintiff has not alleged or demonstrated that CESD discriminated against her on the basis her race; therefore CESD is entitled to summary judgment as to Plaintiff's 42 U.S.C. § 1981 claim in Count III. Also, because CESD is entitled to summary judgment with respect to Plaintiff's substantive claims under the ADA and ADEA, CESD is also entitled to summary judgment as to Plaintiff's claim in Count III arising under 42 U.S.C. § 1981a.

Accordingly, the Court ORDERS that Defendant's Motion for Summary Judgment be, and it is hereby, **GRANTED.**